UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 DEC -2 PM 1:16

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| MICHAEL PELLAND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:14-cv-00029 |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**
(Docs. 9 & 13)

Plaintiff Michael Pelland seeks reversal and remand of the Commissioner of Social Security's denial of his application for disability insurance benefits. See 42 U.S.C. § 405(g). Before the court are Pelland's motion to reverse the Commissioner's decision (Doc. 9) and the Commissioner's motion to affirm the decision. (Doc. 13.)

I.  **Background**

Pelland is a thirty-seven-year-old male. On December 1, 2001, his alleged disability onset date, he injured his back lifting a washing machine while working at Rentway, a furniture company. He was subsequently diagnosed with a herniated disc at L5-S1. (AR 306.) He declined surgery for the back injury. (AR 405.)

Pelland suffers from back pain due to his injury. He has multiple fractures in his right hand due to punching objects. (AR 874.) He also suffers from depression and anxiety, attention deficit hyperactivity disorder, and hypertension. (AR 219.) He has been diagnosed with specific learning disorders in reading comprehension and math reasoning. (AR 863.) In high school, Pelland was placed on an Individualized Education Program (IEP) for learning difficulties in English. (*Id.*) He graduated from high school in 1996. (AR 858.)

1

Pelland joined the Marine Corps and made it through boot camp and infantry school, but was discharged in 1998 after he developed a testicular hernia. (AR 28, 220.) After leaving the military, he worked as a security guard for less than a year, then went to work for Rentway. (AR 220.) He has not worked since he injured his back in December 2001. (AR 750.)

Pelland is single and lives alone in subsidized housing. (AR 205.) He has two minor sons from prior relationships. (AR 197, 1056.) He rarely sees his older son, but has two days a month of visitation with his younger son, a toddler. (AR 1068.) He reports that he spends most days sleeping, watching TV or playing video games. (AR 30.)

## II.     Procedural History

Pelland filed his current application for disability benefits on December 29, 2006. (AR 196.) Federal review officials denied his claim in April 2007 and again in April 2008. (AR 81, 110). Following a hearing, Administrative Law Judge (ALJ) Thomas Merrill issued an April 10, 2010 decision in which he found that Pelland was not disabled at step four of the sequential evaluation process. (AR 17.) After the Decision Review Board declined to disturb the ALJ's decision, Pelland appealed to this court. (AR 1, 760A-B.) On March 31, 2011, the parties stipulated that the case would be voluntarily remanded for a further administrative proceeding. (AR 760B.)

On April 20, 2012, the Appeals Council found that the ALJ had failed to address opinions of certain treating physicians that suggested Pelland had greater limitations than the ALJ determined. Accordingly, it vacated the April 2010 decision and remanded the case for a new hearing. (AR 765.) On January 25, 2013, the ALJ again determined that Pelland was not disabled. (AR 745-60.) The Appeals Council declined to take jurisdiction of Pelland's appeal, finding that the ALJ's decision was supported by substantial evidence. (AR 739-42.) Pelland appealed to this court on February 11, 2014. (Doc. 1.)

## III.    The ALJ's January 2013 Decision

The Commissioner uses a five-step sequential process to decide whether an individual is disabled. See *Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). At the first step, the ALJ determines if the individual is engaged in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If not, the ALJ then considers whether the individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or is expected to last continuously for at least twelve months. *Id.* §§ 404.1520(a)(4)(ii); 416.909; 416.920(a)(4)(ii). At the third step, the ALJ considers whether the individual has an impairment that "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I. *Id.* §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). An individual is presumed to be disabled if he or she has a listed impairment. *Id.*; *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the individual is not presumptively disabled, the ALJ then considers the individual's residual functional capacity (RFC), which means the most work the claimant can still do despite his or her impairments based on all the relevant medical and other evidence in the record. At this step, the ALJ also considers whether the individual can still perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1545(a); 416.920(a)(4)(iv). Finally, at step five, the ALJ considers whether the individual can perform "any other work." *Id.* §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g). The claimant bears the burden of proof at steps one through four. *Butts*, 388 F.3d at 380-81. At step five, there is "a limited burden shift to the Commissioner," requiring her to show only "that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

Applying this framework, the ALJ found that Pelland had not engaged in substantial gainful activity since his alleged onset date of December 1, 2001. The ALJ next determined that Pelland had severe medically determinable impairments of "non-stenotic degenerative changes at L5, a depressive disorder, and ADHD." (AR 751.) The ALJ noted that Pelland had broken his hand multiple times while punching things, but found that any impairment was temporary and that he did not appear to have ongoing limitations related to these injuries. The ALJ also stated that Pelland's diagnosis of learning disorders was not medically determined. (*Id.*)

At step three, the ALJ found that Pelland did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*)

At step four, the ALJ determined that Pelland had an RFC to perform light work, except that he was limited to tasks involving no more than three to four steps. He found that Pelland

3

could sustain concentration, persistence and pace eight hours per day for forty hours a week, could collaborate with coworkers and supervisors, and could maintain a schedule, recognize work hazards, and manage routine changes. (AR 752.)

At the fifth and final step of his analysis, the ALJ determined that Pelland was capable of performing his previous work as a security guard. However, because Pelland failed to provide information about that position, the ALJ could not determine whether it constituted "past relevant work" as defined by the regulations. Accordingly, the ALJ went on to determine that there were other jobs that exist in significant numbers in the national economy that Pelland could perform, such as "marker," "bakery/line worker," and "ticket seller." (AR 759.) The ALJ concluded that Pelland was not disabled from the alleged onset date until January 25, 2013, the date of the ALJ's decision. (AR 760.)

### IV.   Standard of Review

This court reviews the administrative record *de novo* to determine whether the Commissioner's decision is supported by "substantial evidence" and uses the correct legal standard. *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see also* 42 U.S.C. § 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 566 F.3d at 305 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where there is substantial evidence to support either position, the determination is one to be made by the factfinder. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). In reviewing a decision of the Commissioner, this court must be mindful of the remedial purpose of the Social Security Act. *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

### V.   Analysis
#### A. Whether the ALJ Erred by Finding that Pelland Did Not Have Medically Determinable Learning Disorders

Pelland argues that the ALJ improperly substituted his own judgment for that of an acceptable medical source by finding that Pelland did not have medically determinable reading and math learning disorders.

4

Dr. Dean Mooney, a licensed clinical psychologist, met with Pelland in September 2008 at the request of his vocational counselor. Dr. Mooney administered the WIAT-II to Pelland along with other tests. (AR 857.) The WIAT-II is a test that measures basic academic achievement. (AR 862.) Based on significant discrepancies between Pelland's actual and predicted scores on this test, Dr. Mooney diagnosed Pelland with learning disorders in the areas of math reasoning, reading comprehension, and written expression. (*Id.*)

> At step two of his analysis, the ALJ stated:
>
> I note that the diagnosis of learning disorder comes from consultative examiner Dr. Mooney, who administered the WIAT-II and found that the claimant had a significant discrepancy in scores. Due to such discrepancy, and due to the claimant not alleging a learning disorder, the undersigned does not find that the condition is medically determined. (AR 751.)

As Pelland correctly points out, a significant discrepancy between a person's expected and actual scores on standardized tests in reading, mathematics or written expression is what indicates that the person has a learning disorder. (Doc. 9 at 9; AR 863.) As a licensed clinical psychologist, Dr. Mooney is an "acceptable medical source" under the regulations. 20 C.F.R. § 404.1515(a)(2). His diagnosis of Pelland's learning disorder is supported by acceptable clinical diagnostic techniques and is not inconsistent with other substantial evidence in the case record. *Id.* § 404.1527(c). The ALJ therefore erred in finding that Pelland's learning disorders were not medically determined.

However, the ALJ's error was harmless because there is no indication anywhere in the record that Pelland's learning impairments were "severe." *Id.* §§ 404.1520(a)(4)(ii). An impairment is severe only if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). "Basic work activities" are defined in the regulations as "the abilities and aptitudes necessary to do most jobs," including:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

*Id.* § 404.1521. The claimant has the burden at step two of proving that his or her impairment is severe. *Id.* § 404.1520(c); *Butts*, 388 F.3d at 383.

As the ALJ noted, Pelland did not claim that his learning disorders prevented him from performing basic work activities. (AR 751.) Nor does Dr. Mooney's opinion state that Pelland's reading and math disorders limit his ability to do basic work activities. Dr. Mooney opines that Pelland may have difficulties in taking notes or copying from a blackboard, and may need accommodations in writing assignments. (AR 867.) Dr. Mooney also states that "Michael may need extra help and support with math, when he is expected to solve word problems or numerical operations. He will need extra time and additional explanation of what he needs to do." (*Id.*) He further states that "Michael's verbal comprehension skills were within the average range, but given demonstrated stronger visual abilities, he may have difficulties following complex directions or concepts presented in a lecture or reading format." (AR 868.) He notes that Pelland "relies heavily on visual information; therefore, employers may wish to take advantage of his strengths in nonverbal skills and perceptual organization." (AR 868.)

The limitations identified by Dr. Mooney would impair Pelland's ability to perform well in an educational setting. However, Dr. Mooney does not opine that Pelland's reading and math disorders will significantly limit his physical abilities or his ability to use judgment, interact with supervisors and co-workers, or deal with changes in a work setting.

Moreover, the record as a whole does not show that Pelland's learning disorders were severe impairments. Pelland was able to graduate from high school with an IEP. (AR 27.) Dr. Mooney found that he had a full scale IQ score of 97, which is within average range. (AR 861.) Prior to leaving the military for medical reasons, Pelland was training to become a "mortar man," which he described as requiring "mechanical math skills." (AR 28.) He performed the jobs of driver and delivery worker and security guard, each of which typically involves some degree of independent judgment. (AR 1088-89.) There is no indication that Pelland's learning disorders were a significant impediment to his performance in his former jobs or that they would affect his ability to perform future work. Nor is there any indication that Pelland developed these learning disorders after he stopped working in 2001.

Any error at step two was also harmless because the ALJ went on to analyze the remaining criteria based on all of Pelland's impairments. *See Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (noting that there was no error by ALJ in finding disc herniation non-severe because ALJ did identify other severe claims at step two so that claim proceeded through the sequential evaluation process and all impairments were considered in combination). The ALJ considered Dr. Mooney's opinion in the context of his RFC analysis. The ALJ noted that Dr. Mooney had found that Pelland had average cognitive functioning and "would express his knowledge and understanding of information best through hands-on projects." (AR 757.) He gave Dr. Mooney's opinion little weight in determining RFC because "it does not fully address the claimant's functional abilities and limitations." (*Id.*) The ALJ's evaluation of Dr. Mooney's opinion as it relates to the RFC analysis is supported by the evidence. Dr. Mooney was a consultative examiner who only saw Pelland on one occasion. As discussed above, Dr. Mooney's opinion related mainly to Pelland's ability to function in a school setting, and did not attempt to assess whether his limitations affected his ability to work. While Dr. Mooney did opine that Pelland might have difficulty following complex instructions, the ALJ accounted for this limitation by finding that Pelland's RFC was limited to three- to four-step tasks. (AR 752.)

### B. Whether the ALJ's Hypothetical to the Vocational Expert Accurately Reflected Pelland's Limitations

Pelland argues that the ALJ improperly relied on the testimony of the vocational expert (VE) because the ALJ's hypotheticals to the VE did not accurately reflect Pelland's limitations. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (citations omitted).

Pelland contends that because the ALJ's hypothetical question to the VE did not include limitations based on his learning disorders, the VE incorrectly testified that Pelland could work as a "marker," a job that requires reading skills and copying. (Doc. 9-3.) The ALJ's hypotheticals to the VE were based on his RFC assessment, which did not include limitations for learning disorders. Because Pelland failed to show that these disorders significantly limited his ability to perform basic work activities, however, the ALJ did not err by failing to include them

7

in his RFC or his hypothetical to the VE. At any rate, even if Pelland had demonstrated that his learning disorders prevented him from working as a marker, the record shows that there were other jobs in the national economy that Pelland could perform such as security guard, bakery worker, or ticket seller. Pelland does not argue that his learning disorders affected his ability to perform these positions.

Pelland also argues that the hypothetical question to the VE was inconsistent with the limitations identified by Dr. Joseph Patalano and Dr. Matthew Zmurko, physicians whose opinions the ALJ gave significant weight. If the hypothetical had included these limitations, he argues, the three remaining occupations identified by the VE would be eliminated.

Dr. Patalano, an agency psychologist, reviewed Pelland's medical records and opined that Pelland retained the ability to perform three- to four-step tasks, but was limited from high-stress tasks due to his depression, ADHD and personality traits. He stated that Pelland may have occasional problems with concentration, persistence and pace due to intermittent, temporary increases in depression symptoms associated with health or environmental stressors that reduce cognitive efficiency. Otherwise, Pelland could sustain concentration, persistence and pace for two-hour periods during a normal workday. (AR 569.) The ALJ gave Dr. Patalano's opinion great weight. (AR 757.)

Pelland argues that the ALJ failed to account for either his occasional problems with concentration, persistence and pace or the low-stress limitation in his hypothetical to the VE. The first argument is unpersuasive. The ALJ concluded that Pelland was able to maintain concentration for up to two hours at a time and perform three- to four-step tasks, which is consistent with Dr. Patalano's opinion that Pelland was generally able to maintain concentration, persistence and pace during a typical workday. (AR 569, 752.)

Pelland argues that remand is required because the ALJ did not include a low-stress limitation in his RFC despite giving Dr. Patalano's opinion great weight. The ALJ did ask the VE whether the jobs the VE said Pelland could perform given his RFC were "high stress jobs." (AR 1091.) The VE responded that bakery/line worker would be the most stressful of the three jobs that he identified, but he would not consider the jobs of marker and ticket seller to be "high

8

stress." (AR 1091-93.) At the prior hearing, the VE testified that with a low-stress limitation, Pelland would still be able to perform his past work as a security guard. (AR 18, 27.)

Pelland argues that the ALJ incorrectly found that Pelland could perform the position of bakery/line worker, given the VE's testimony that it was "a difficult and stressful job." (AR 1092.) Any error is harmless, however, because the record supports the ALJ's determination that Pelland could perform other jobs that exist in significant numbers in the national and local economy such as security guard and ticket seller. *See* 20 C.F.R. § 404.1566(b); *Hollenbeck v. Comm'r of Soc. Sec.*, No. 7:12-CV-1240, 2013 WL 3712441, at *20 (N.D.N.Y. July 12, 2013) ("While there were not many jobs cited by the VE, what constitutes a 'significant number' is 'fairly minimal.'" (citation omitted)); *Shaw v. Comm'r of Soc. Sec.*, No. 7:11-CV-1463, 2013 WL 316616, at *9 (N.D.N.Y. Jan. 28, 2013) (holding that the VE's finding of one job that claimant could perform despite limitations was sufficient to meet ALJ's burden at step five).

Pelland also claims that the ALJ improperly ignored the opinion of Dr. Zmurko, a physician at Vermont Orthopedic Clinic who treated Pelland for his back pain and stated that Pelland "can do . . . no repetitive lifting, twisting, or bending-type activities." (AR 619.) The ALJ did not include this limitation in his RFC, but did include it in his hypothetical to the VE. (AR 752, 1092.) When the ALJ added this limitation, the VE stated that the bakery/line worker job would be eliminated, but it would not eliminate the jobs of marker and ticket seller. (*Id.*) Again, any error was harmless because the ALJ identified at least one other occupation besides bakery/line worker that is present in significant numbers in the national economy and that a person with Pelland's limitations could perform. *See* 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.").

### C. Whether the ALJ Improperly Discounted the Opinion of Pelland's Vocational Counselor

Pelland argues that the ALJ should have given greater weight to the opinion of Mary Jean Inglee, M.S., a vocational rehabilitation counselor. In a December 2009 letter, Inglee stated that Pelland "was self-referred to VocRehab Vermont in February 2004." (AR 284.) She stated that "[w]e at VR were familiar with Mr. Pelland since his time in high school when he worked with

9

the transition program counselor. Upon graduating from high school Mr. Pelland entered the US Marine Corp[s] and, at that time, the VR Case was closed." (*Id.*) Inglee stated that she had observed in Pelland "a marked decrease in grooming and severely decreased ability to follow conversation and to retain provided guidance and recommendations for help." (*Id.*) Inglee stated that he showed "serious anxiety when asked to interact with transportation sources, medical or mental health offices to make appointments or arrangements for needed services. . . . He is unable to cancel appointments due to his anxiety and has lost medical and mental health providers due to this." (*Id.*)

Inglee further noted that Dr. Mooney had assessed a GAF score of 51, and that in her years of experience, that score precludes full-time employment without many special accommodations under the ADA. (AR 284-85.) Ms. Inglee stated that she had reviewed the Social Security POMS guidelines and in her professional opinion, Pelland had a "substantial loss" in the mental abilities needed for any job, such as the abilities to carry out instructions, maintain attention and routine, work with others, and adhere to basic standards of neatness and cleanliness. (AR 285.) She stated that "[t]he fact that Michael Pelland has been engaged with this agency for years and has made no progress is further evidence that he does not have the capacity for gainful employment." (AR 285.)

The ALJ is required to consider evidence from non-medical sources who have had contact with the individual in their professional capacity. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). In determining how much weight to give opinions of non-medical sources, the ALJ should consider the length and nature of the source's relationship with the claimant, whether the opinion is supported by relevant evidence and is consistent with other evidence in the record, how well the source explains his or her opinion, whether the source is a specialist or expert in an area related to the claimant's impairment, and any other factors that tend to support or refute the opinion. *Id.* at *5. Not every factor will apply in every case. *Id.* An opinion from a non-medical source may outweigh the opinion of a medical source "if the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." *Id.* at *6.

The ALJ gave Inglee's opinion "little weight" because she was not an acceptable medical source under the regulations and her opinion was not consistent with the evidence in the record. (AR 758.) The ALJ's decision is supported by substantial evidence. As the ALJ pointed out, although Pelland had been involved with Inglee's office during high school and from 2004 onward, there was no evidence that Inglee herself had worked with Pelland for that entire time. Her opinion was unsupported by any contemporaneous consultation records or notes. In assessing Pelland's capability to work, Inglee did not make any reference to Pelland's work history in the Marines or after discharge. Her description of Pelland's appearance and cleanliness is contradicted by medical notes from various providers which consistently report him to be a well-groomed, healthy-appearing young man with an athletic build. (AR 367, 878, 886, 922, 925, 927.) Her opinion that Pelland could not work was inconsistent with objective medical evidence which showed that Pelland was physically capable of light work. (AR 619.) Finally, while the GAF score of 51 assessed by Dr. Mooney does correlate to moderate difficulties in social or occupational functioning,[1] "a claimant's GAF score is not dispositive of [his] ability to work but is 'one factor' for the ALJ to consider in determining whether the claimant is disabled." *Chandler v. Soc. Sec. Admin.*, No. 5:12-cv-155, 2013 WL 2482612 at *9 (D. Vt. June 10, 2013).

Pelland argues that Inglee's opinion should have been given greater weight because it is supported by the assessment of Stephen Knisely, a licensed clinical social worker who met with Pelland for individual psychotherapy.[2] In 2010, Knisely completed a form for the State of Vermont so that Pelland could receive general assistance. In the form, Knisely states that Pelland is unable to work due to "major depressive disorder and generalized anxiety DO which limit ability to be in public, focus concentration and reduces motivation." (AR 738.) The ALJ

---

[1] A GAF in the range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Zabala v. Astrue*, 595 F.3d 402, 406 n.3 (2d Cir. 2010).

[2] The ALJ incorrectly referred to Knisely as "Stephen Knisely, M.D." and "Dr. Knisely" in the portion of his decision discussing Pelland's RFC. (AR 757.) He may have confused Knisely with the agency consulting physician called Geoffrey Knisely, who reviewed Pelland's medical record. (AR 578.) The substance of the discussion indicates that the ALJ was clearly discussing the opinion of Stephen, not Geoffrey.

gave Knisely's opinion some weight as a treating medical source, but found that his opinion that Pelland was unable to work due to poor motivation and focus was unsupported by the record which shows, among other things, that Pelland is able to play video games for up to twelve hours at a time. (AR 33.) The ALJ's assessment of Knisely's opinion is supported by the record.

Pelland also argues that Inglee's opinion is supported by that of Dr. Stephen Mann, a licensed psychologist at the Occupational Disability Management Center who met with Pelland several times in 2005. The court agrees that portions of Dr. Mann's opinion are consistent with Inglee's opinion. In May 2005, Dr. Mann assessed Pelland using the Millon Behavioral Medicine Diagnostic. (AR 589-90.) The diagnostic indicated "poor abilities in functional activities of daily living with heighted self-perceived functional issues." (AR 590.) Dr. Mann concluded that Pelland "has a tremendously heightened sense of his own disability and is convinced that he has functional deficits that leave him disabled. This young 27-year-old man has a significant behavioral overlay complicating his recovery from his reported back symptoms." (AR 592.) He noted that Pelland's "future pessimism, amplified pain sensitivity, and severe functional deficits and illness apprehension make him a challenging rehabilitation patient particularly in terms of compliance." (AR 592.) He did not specify whether Pelland had functional deficits in any areas besides activities of daily living.

Following another visit, Dr. Mann noted that Pelland reported opiate medications were ineffective in relieving his pain, even at significant doses, and stated that "this suggests more strongly that a significant amount of Mike's pain is psychogenic in nature. This is not suggesting that his pain is not real but rather that emotional factors play a significant role in pain perception." (AR 582.) He also noted that Pelland "has severe attention deficit disorder which has significantly created financial and job related stress." (AR 581.)

The ALJ gave Dr. Mann's opinion significant weight with regard to Pelland's mental health presentation, but did not give it controlling weight with regard to RFC because Dr. Mann did not assess Pelland's functional abilities and limitations. (AR 756) Although the diagnostic test performed by Dr. Mann indicated that Pelland's difficulties with activities of daily living were "severe," the ALJ ultimately concluded based on the other evidence in the record that Pelland had only mild difficulties in this area.

12

Where there is substantial evidence to support either position, the determination is one to be made by the factfinder. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). The ALJ's conclusion is supported by substantial evidence. Pelland reported that he was able to prepare food for himself and do housework such as laundry and dishes. (AR 245.) The record shows that he regularly socializes with others at bars (AR 636, 918, 923) and engages in athletic activities such as weightlifting and golf. (AR 874, 885). As noted above, he generally presents as well-groomed. His medical records over the past decade indicate that his neurological functioning was mostly normal and that he generally walked with a normal gait. (AR 306, 321, 377, 483, 653, 967, 983.) These facts support the conclusion that Pelland had only mild difficulties in activities of daily living, despite Dr. Mann's opinion.

For the reasons above, the ALJ's decision to give counselor Inglee's opinion little weight is supported by the record.

### D. Whether the ALJ Incorrectly Determined that Pelland Could Perform His Past Relevant Work

Finally, Pelland argues that his job as a security guard cannot be considered "past relevant work" under the regulations, because he only earned $340.50 in that position. In considering whether a claimant can perform his or her past relevant work, the ALJ may only consider work that the claimant did within the last fifteen years, that lasted long enough for the claimant to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a). Work is "substantial" if it "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). It is "gainful" if it is "the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.* § 416.972(b); *see also Melville v. Apfel*, 198 F.3d 45, 53 (2d Cir. 1999).

The ALJ accepted the VE's testimony that Pelland's RFC would allow him to perform his past work as a security guard. (AR 758, 1090.) However, as the ALJ noted, there is conflicting evidence in the record regarding how much Pelland earned as a security guard. (AR 758.) In a disability report, Pelland stated that he worked full time as a security guard in 1998. (AR 220.) In a work history report, Pelland stated that he worked as a security guard from October 1998 through March 1999, but did not provide information about hours worked or compensation. (AR 253.) His earnings record showed that he earned $8,233.79 in 1998 and

13

$9,809.20 in 1999. (AR 211.) However, it appears that his employer reported his total income to be only $340.50. (AR 818.) The ALJ found the evidence to be unclear as to whether his security guard position "rises to the level of past relevant work, due to the claimant's failure to provide requested information." (AR 758.) The ALJ accordingly proceeded to determine whether there were other jobs in the national economy that Pelland could perform.

There was no error in the ALJ's step five determination. Even if the particular position that Pelland held did not qualify as "past relevant work" because it was not substantial gainful activity, the VE testified that the job of security guard was a job that Pelland could perform given his RFC. (AR 27.) Further, the ALJ did not stop his analysis after determining that Pelland could perform his previous job as a security guard. He went on to consider whether there were other jobs in the national economy that Pelland could perform despite his limitations. (AR 759.) Because such jobs existed, the ALJ properly determined that Pelland was not disabled.

## VI.   Conclusion

The court DENIES Pelland's motion (Doc. 8), GRANTS the Commissioner's motion (Doc. 13), and AFFIRMS the decision of the Commissioner.

Dated at Rutland, in the District of Vermont, this 2nd day of December, 2014.

_____
Geoffrey W. Crawford, Judge
United States District Court